# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# EASTERN DIVISION

| | |
|---|---|
| REBECCA M. SHADY, | |
| Plaintiff, | No. C05-1014 |
| vs. | **ORDER** |
| JO ANNE B. BARNHART, Commissioner of Social Security, | |
| Defendant. | |

This matter comes before the court pursuant to briefs on the merits of this application for disability insurance benefits. On April 18, 2005, the parties consented to the exercise of jurisdiction by a United States Magistrate Judge pursuant to 28 U.S.C. § 636(C). The final decision of the Commissioner of Social Security is affirmed and this matter is dismissed.

## PROCEDURAL BACKGROUND

Plaintiff Rebecca Shady applied for Title II Social Security benefits and Title XVI supplemental security income benefits on July 30, 2002, alleging an inability to work since May 17, 1999, due to diabetes, heart disease, and high blood pressure. Ms. Shady's application was originally denied and was denied on reconsideration. A hearing before Administrative Law Judge (ALJ) Patricia L. Flierl was held on July 15, 2004. At the hearing, Ms. Shady amended her alleged onset date to August 1, 2001. As the amended onset date is after Ms. Shady's date last insured, her claim now is for supplemental security income only. In an opinion dated September 20, 2004, the ALJ denied benefits. On February 11, 2005, the Appeals Council denied Ms. Shady's request for review. This action for judicial review was filed on March 22, 2005.

1

# FACTUAL BACKGROUND

Ms. Shady was born on May 22, 1960 and is a high school graduate. Her primary care physician is Dr. Eric Petersen, who has seen Ms. Shady approximately twice per month for the last five years. Her treating cardiologist is Dr. Albaghdadi.

Ms. Shady's medical records indicate that she underwent surgical myocardial revascularization (heart bypass surgery) on May 17, 1999. (Tr. 139-145). Ms. Shady was admitted to Samaritan Health System on May 27, 1999 and discharged on June 2, 1999 with the pertinent final diagnoses of: (1) status post coronary artery bypass graft surgery; (2) pericarditis; (3) hypoglycemic attacks; (4) hypertension; (5) diabetes type I; (6) nontransmural MI; (7) status post balloon angioplasty, left circumflex coronary artery; (8) reflux esophagitis; (9) obesity. (Tr. 159). On June 2, 1999, Ms. Shady was administered a stress test which found: (1) normal BP response; (2) no cardiac arrhythmias; (3) no symptoms of angina; (4) no ST segment abnormalities; and (5) myocardial scintigraphy images showed no evidence of ischemia or MI and borderline LV function, ejection fraction, 54%. (Tr. 160). Ms. Shady's resting EKG showed sinus rhythm, pericarditis changes, incomplete right bundle branch block, poor R wave progression, and nonspecific ST-T abnormalities. (Tr. 160).

Ms. Shady was admitted to Mercy Medical Center in Clinton, Iowa on February 3, 2002 and discharged on February 4, 2002. (Tr. 151). Ms. Shady's chief complaint was chest pain. (Tr. 157, 190). A chest x-ray administered on February 3, 2002 found a normal heart size, lungs which were well expanded and clear, no failure, vascular congestion or interstitial edema. (Tr. 153). The impression was a normal study. (Tr. 153). Her Sestamibi stress test report dated February 4, 2002 was interpreted as a normal stress test exercise response with the following findings: (1) no symptoms of angina; (2) normal BP response; (3) no cardiac arrhythmias; (4) no ST segment abnormalities; and (5) myocardial scintigraphy images showed no evidence of ischemia or MI with normal ejection fraction of 61%. (Tr. 152). Her resting EKG revealed sinus

rhythm and nonspecific ST-T abnormalities. (Tr. 152). Her final diagnoses were: (1) chest pain to be evaluated; (2) status post coronary artery bypass graft surgery; (3) diabetes mellitus; (4) hyperlipidemia; and (5) obesity. (Tr. 151).

On March 26, 2002, Ms. Shady was seen at the Jackson County Public Hospital emergency room for a "sharp stabbing pain in her left neck area going into the left upper shoulder area." (Tr. 265). Notes from this visit indicate that an EKG in comparison with the one in February looked unremarkable without any acute pathology, Ms. Shady's cardiac enzymes were negative, and her chest x-ray did not show any acute pathology. (Tr. 265). The assessment stated that Ms. Shady's left neck and should pain was likely musculoskeletal and not cardiac. (Tr. 265).

On June 4, 2002, Ms. Shady was seen for knee discomfort. (Tr. 262). On June 24, 2002, Ms. Shady was seen by Dr. Paul Koob. (Tr. 260). Dr. Koob's notes state that "[h]er heart is in pretty good shape right now, but she has multiple difficulties as far as her cardiac status." (Tr. 260). Dr. Koob further stated that "[s]he has multiple health problems that would indicate it is very difficult for her to maintain good employment. We discussed these options, and he [sic] may talk with disability." (Tr. 260).

On July 17, 2002, Ms. Shady was seen at the Jackson County Public Hospital emergency room in Maquoketa, Iowa, complaining of chest pain. (Tr. 181). An EKG showed normal sinus rhythm with an incomplete right bundle branch block, nonspecific ST abnormalities, and no acute changes. (Tr. 181). A chest x-ray was taken and compared to a previous x-ray. (Tr. 181) No acute changes were noted. (Tr. 181). The x-ray indicated no evidence of active heart or lung disease. (Tr. 182) Ms. Shady's medical assessment included chest pain, coronary artery disease, type II diabetes mellitus, hyperlipidemia, depression, and gastritis. (Tr. 181).

Ms. Shady was seen again in the Jackson County Public Hospital emergency room on July 19, 2002, complaining of left shoulder and arm pain. (Tr. 195). A portable chest x-ray was taken which showed no acute disease. (Tr. 195). Specifically, the radiologist's

3

findings stated "No definite pneumonia and no pulmonary edema is seen and the heart size and mediastinal contours are within normal limits. (Tr. 197). Ms. Shady's EKG was normal. (Tr. 195).

On August 29, 2002, Ms. Shady had a stress test which was non ischemic. (Tr. 273, 274). The "Resting ECG" stated: "Sinus rhythm and complete right bundle branch block. Q-wave in the inferior leads. Non-specific STT wave abnormalities." The interpretation of the test stated: "Normal stress test exercise response. No symptoms of angina . . . There were no cardiac arrhythmias. Echocardiographic images at rest and at peak exercise showed normal wall motion and normal cavity obliteration. Since 3/6/00, slight worsening in aerobic functional capacity was seen." (Tr. 272).

On September 19, 2002, Ms. Shady saw Dr. Koob regarding her disability application. (Tr. 257). Dr. Koob's notes state: "She has significant coronary artery disease, diabetes and multiple other problems and therefore, I think that she is not in a position that she can work." (Tr. 257). On that same day, Dr. Koob wrote a letter to Human Services in Maquoketa outlining Ms. Shady's various health conditions and stating that "[s]he therefore is incapacitated as far as any type of physical employment. Family history is also very significant as she had a sister die at a very young age of similar type problems. Therefore, I recommend that she not work." (Tr. 258). On September 25, 2002, Ms. Shady was seen by Dr. Raymond Hamilton for myofascial strain in the region of the scapula. (Tr. 256).

On October 1, 2002, Ms. Shady was seen at the Jackson County Public Hospital emergency room in Maquoketa, Iowa, for mid-sternal chest pain. (Tr. 254). The examination revealed a regular heart rate and rhythm without murmur and that her lungs were clear through all fields. (Tr. 254). She was assessed as having angina. (Tr. 255).

A November 13, 2002 x-ray of Ms. Shady's right knee revealed "no fractures or subluxations." (Tr. 207). It was also noted that there were "[n]o significant degenerative changes" seen and that the "patellogemoral joint space is not narrowed." (Tr. 207).

On December 23, 2002, an agency residual functional capacity assessment was completed by Dr. H. Richard Hornberger. (Tr. 209-213). Dr. Hornberger opined that Ms. Shady could occasionally climb, stoop, kneel, crouch, and crawl, and could frequently balance. (Tr. 210). He further opined that Ms. Shady, based upon her coronary artery disease, should avoid concentrated exposure to extreme cold, extreme heat, and fumes, odors, dusts, gases, and poor ventilation, but that she was unlimited in her exposure to wetness, humidity, noise, vibration, and hazards. (Tr. 212). Dr. Hornberger disagreed with Dr. Koob's September 2002 recommendation that Ms. Shady not work, stating that it should not be given controlling weight as the objective evidence in the MER does not support that Ms. Shady is unable to do any work. (Tr. 213, 215).

On December 30, 2002, Ms. Shady was referred by Disability Determination Services for a phychodiagnostic mental status exam. (Tr. 217-219). As part of this evaluation, Ms. Shady reported that she can prepare meals for her children, do housekeeping, and tries to go and/or participate in her children's school programs and activities. (Tr. 218). Ms. Shady indicated that she can do the following activities without assistance: use a telephone, prepare simple meals, dress, wash, use the toilet, pay her bills, balance her checkbook, keep track of money, shop for food and necessities, and drive if her car is running. (Tr. 218). Ms. Shady was diagnosed as having a depressive disorder with a global assessment of functioning (GAF) of 64, which indicates mild to moderate restrictions. (Tr. 219, 223).

Regarding her work-related limitations, Ms. Shady was found able to remember and understand instructions, procedures, and locations, and able to maintain sufficient attention, concentration, and pace to adequately carry out instructions in the workplace. (Tr. 300). Further, she would have some difficulty relating to supervisors, co-workers, and the public, but could handle it in general. (Tr. 300). She would be able to use good judgment, but would have difficulty adjusting to changes in the workplace. (Tr. 300).

On April 8, 2003, Ms. Shady saw Dr. Petersen for a recheck and refill of her medications. (Tr. 229). During this visit, she reported to Dr. Petersen that she was feeling fine and had no complaints. (Tr. 229). On April 22, 2003, Ms. Shady was seen by Dr. Petersen for complaints of pain in the left posterior rib area and right knee discomfort. (Tr. 227). Dr. Petersen diagnosed Ms. Shady as suffering from left rib pain and right patellar femoral syndrome, noting "I think that this is just purely patellar problem." (Tr. 227).

A chest x-ray taken on May 6, 2003 indicated no change since April 14, 1999. (Tr. 272). On May 12, 2003, Ms. Shady had a stress test. (Tr. 272). Doctor's notes indicate the test was "symptom limited with no angina. No change in regimen is needed." (Tr. 272). Dr. Albaghdadi's notes from a July 10, 2003 visit state: "Patient recently had a stress test which was non ischemic. No activity limitation and no change in medications." (Tr. 272).

An abdominal ultrasonography was conducted on Ms. Shady on July 22, 2003. (Tr. 271). It failed to show any evidence of aneurysmal dilatation, revealing an abdominal aorta that is normal in overall diameter and normal iliac vessels. (Tr. 271). It was a normal exam. (Tr. 271).

On August 6, 2003 Dr. Petersen completed a residual functional capacity assessment (RFC) for Ms. Shady. (Tr. 280-83). Dr. Peter's RFC stated Ms. Shady's diagnoses as: coronary artery disease, type II diabetes mellitus, hyperlipidemia, poor dentation with abscesses, GERD, HTN, dyspnea with exertion, arthritis of knees, HA, and obesity. (Tr. 280). He listed her prognosis as "poor." (Tr. 280). Dr. Petersen identified Ms. Shady's symptoms as including fatigue, extremity pain and numbness, difficulty walking, muscle weakness, episodic vision blurriness, hot flashes, sweating, trouble sleeping, difficulty thinking/concentrating, rapid heart beat/chest pain, vascular disease/leg cramping, and headaches. (Tr. 280). Dr. Petersen opined that Ms. Shady was capable of working low stress jobs only, as stress causes her chest pain and increased blood

6

pressure. (Tr. 281). Dr. Petersen stated that Ms. Shady's medications have no side effects that would implicate her ability to work, and stated that Ms. Shady's impairments are expected to last "forever." (Tr. 281).

Dr. Petersen opined that Ms. Shady could sit for 15 minutes at a time, stand for 45 minutes at a time, sit for less than two hours in an eight-hour work day, and stand or walk for about two hours of an eight-hour work day. (Tr. 281). Dr. Petersen stated that Ms. Shady could only work at a job which would permit her to shift positions at will from sitting, standing or walking, and that Ms. Shady would have to get up an walk around for five minutes every 15 minutes. (Tr. 282). Dr. Petersen opined that Ms. Shady would have to take unscheduled breaks during an eight-hour work day, and may need to do so as often as every hour. (Tr. 282). Dr. Petersen stated that Ms. Shady could lift less than 10 pounds frequently, 10 to 20 pounds occasionally, and never 50 pounds. (Tr. 282). He stated that Ms. Shady could twist, stoop (bend), and climb stairs occasionally, crouch rarely, and never climb ladders. (Tr. 282). Dr. Petersen opined that Ms. Shady had no restriction in being exposed to perfumes, should avoid concentrated exposure to extreme cold and solvents/cleaners, should avoid even moderate exposure to extreme heat, chemicals, irritants, or allergens, and should avoid all exposure to high humidity, fumes, odors, dusts, gases, and cigarette smoke. (Tr. 282). Dr. Petersen estimated that Ms. Shady would likely be absent from work more than four days per month as a result of her impairments or treatment. (Tr. 282).

On November 17, 2003, Dr. Hornberger again reviewed Ms. Shady's medical records and affirmed his December 23, 2002 RFC assessment as written. (Tr. 214).

On December 16, 2003, Ms. Shady had a chest x-ray. (Tr. 294). The radiologist's findings state: "Heart size upper normal without evidence for interstitial or pulmonary edema. Lung fields free of focal consolidations and nodules, mild basilar chronic interstitial change. Nor pneumothorax or pleural effusions. Mild thoracic degenerative

change." The radiologist's impression was "[m]ild chronic interstitial change and post surgical change, no active disease." (Tr. 294).

On January 5, 2004, Ms. Shady was seen by Dr. Hamilton for a recheck and refills of her medications. (Tr. 293). Dr. Hamilton's notes state: "She is not having chest pain or shortness of breath. She feels fine. She ambulates. She is taking care of her grandchild." (Tr. 293). It further states that Ms. Shady "could benefit from some increase in exercise and ambulation." (Tr. 293).

In a letter dated June 23, 2004 regarding Ms. Shady, Dr. Petersen wrote: "I do wish Rebecca well in this regards as I feel that she is a very needy person given her degree of illness related to her heart." (Tr. 304). In a letter dated June 28, 2004, Dr. Albaghdadi wrote that Ms. Shady was evaluated in his office today with a Stress Echocardiogram, which was "abnormal with ST segment changes and wall motion abnormalities noted." (Tr. 305).

At the July 15, 2004 hearing, Ms. Shady testified that her heart problems cause her to tire very fast, usually causing her to sit in a recliner and put her legs up after housecleaning and vacuuming. (Tr. 319). She further testified that she usually experiences chest pain every day and fluttering all of the time, unless she takes nitro and sits down and relaxes. (Tr. 320). She has bad spasms in her legs every night. (Tr. 320). Her legs swell from her legs down to her ankles, such that she cannot wear shoes. (Tr. 321). This happens two or three times per week. (Tr. 321). Ms. Shady testified that her diabetes is controlled with insulin plus two other medications. (Tr. 322). Her blood sugars had been running high, but have come down since using a new medication. (Tr. 322).

Regarding her work limitations, Ms. Shady testified that she can only lift close to ten pounds in a normal day or she starts having chest pain and gets fatigued. (Tr. 324). She said she that she can only be on her feet for 15 minutes at a time before having to sit down and rest because either her legs start hurting, she gets chest pains, or gets really

tired. (Tr. 324). She is limited to sitting for 15 minutes at a time due to the arthritis in both of her knees. (Tr. 324).

Ms. Shady testified that she usually gets four hours of sleep in the night due either to leg spasm or worrying about her children. (Tr. 326). Ms. Shady testified that she sometimes gets headaches from the nitro she takes for her chest pains, and that her other medications make her really tired. (Tr. 327). She has trouble breathing and becomes dehydrated in high humidity, and extreme heat bothers her very badly. (Tr. 328). She has experienced left arm weakness two to three times per month over the last couple of months. (Tr. 329). Ms. Shady testified that she stopped working at Wal-Mart in July of 2001 because she was missing a lot of work. (Tr. 330). Also in 2001 she stopped working as a housekeeper in a hotel because she could not lift and carry the heavy stuff and it made her tire too fast. (Tr. 330). Ms. Shady testified that her condition worsened after 2001, which is why she did not try to get other work. (Tr. 333).

When questioned by the ALJ, the vocational expert, Barbara Laughlin, was posed the following hypothetical:

> [L]et's assume we're dealing with an individual with a 12th-grade education, same age as the Claimant and the same work history. Let's further assume a residual functional capacity for sedentary work. And this individual is unable to do any pushing and pulling of the lower extremities. No climbing, balancing, kneeling, crouching, crawling, or stooping as part of the job duties. I'm going to change that to occasional stooping, but the rest, climbing, balancing, kneeling, crouching and crawling is none. This individual needs a sit, stand option. Could such an individual do any of the Claimant's past work?

(Tr. 334-35). Based upon this hypothetical, the vocational expert testified that Ms. Shady was precluded from performing her past work, but that she could perform the jobs of addresser (490 available locally; 50,000 available nationally), telephone quote clerk (400 available locally; 30,000 available nationally), charge account clerk (350 available locally;

9

58,000 available nationally), and check cashier (500 available locally; 30,000 available nationally). (Tr. 335-36).

The vocational expert was posed a second hypothetical question which added the requirement that the available work be simple and repetitive. (Tr. 336-37). The vocational expert testified that Ms. Shady would still be able to work as an addresser and telephone quote clerk. (Tr. 337). A third hypothetical added the limitation that the available work be "low stress." (Tr. 337). The vocational expert testified that Ms. Shady would be able to work as a document preparer (300 available locally; 15,000 available nationally), addresser, and check cashier. (Tr. 338). The ALJ's final hypothetical added that the individual is unable to maintain concentration, persistence and pace for a seven-and-a-half hours in an eight-hour work day. (Tr. 338). The vocational expert testified that Ms. Shady would be precluded from her past work and that there would be no work available to her given that hypothetical. (Tr. 338).

When questioned by Ms. Shady's attorney, the vocation expert testified that three absences per month or more would not be tolerated in a competitive work setting. (Tr. 339). The vocational expert further testified that a person who needed to take a 15-minute break approximately every hour would not be tolerated in terms of competitive employment. (Tr. 339).

## **CONCLUSIONS OF LAW**
### Scope of Review

In order for the court to affirm the Administrative Law Judge's (ALJ) findings of fact, those findings must be supported by substantial evidence appearing in the record as a whole. See Lochner v. Sullivan, 968 F.2d 725, 727 (8th Cir. 1992); Cruse v. Bowen, 867 F.2d 1183, 1184 (8th Cir. 1989). Substantial evidence is more than a mere scintilla. It means relevant evidence a reasonable mind might accept as adequate to support a

conclusion. Richardson v. Perales, 402 U.S. 389, 401 (1997); Cruse, 867 F.2d at 1184; Taylor v. Bowen, 805 F.2d 329, 331 (8th Cir. 1986). The court must take into account evidence which fairly detracts from the ALJ's findings. Cruse, 867 F.2d at 1184; Hall v. Bowen, 830 F.2d 906, 911 (8th Cir. 1987). Substantial evidence requires "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence." Cruse, 867 F.2d at 1184 (quoting Consolo v. Federal Maritime Comm'n, 383 U.S. 607, 620 (1966)). The court must consider the weight of the evidence appearing in the record and apply a balancing test to contradictory evidence. Gunnels v. Bowen, 867 F.2d 1121, 1124 (8th Cir. 1989); Gavin v. Heckler, 811 F.2d 1195, 1199 (8th Cir. 1987).

## ALJ's Disability Determination

Determining whether a claimant is disabled is evaluated by a five-step process. See 20 C.F.R. § 404.1520(a)-(f); Bowen v. Yuckert, 482 U.S. 137, 140 (1987).

> The five steps are:
>
> (1) If the claimant is engaged in substantial gainful activity, disability benefits are denied.
>
> (2) If the claimant is not engaged in substantial gainful activity, her medical condition is evaluated to determine whether her impairment, or combination of impairments, is medically severe. If the impairment is not severe, benefits are denied.
>
> (3) If the impairment is severe, it is compared with the listed impairments the Secretary acknowledges as precluding substantial gainful activity. If the impairment is equivalent to one of the listed impairments, the claimant is disabled.
>
> (4) If there is no conclusive determination of severe impairment, then the Secretary determines whether the claimant is prevented from performing the work she

11

>performed in the past. If the claimant is able to perform her previous work, she is not disabled.

>(5) If the claimant cannot do her previous work, the Secretary must determine whether she is able to perform other work in the national economy given her age, education, and work experience.

Trenary v. Bowen, 898 F.2d 1361, 1364 n.3 (8th Cir. 1990) (citing Bowen v. Yuckert, 482 U.S. at 140-42); 20 C.F.R. § 404.1520(a)-(f).

"To establish a disability claim, the claimant bears the initial burden of proof to show that he is unable to perform his past relevant work." Frankl v. Shalala, 47 F.3d 935, 937 (8th Cir. 1995) (citing Reed v. Sullivan, 988 F.2d 812, 815 (8th Cir. 1993)). If the claimant meets this burden, the burden of proof then shifts to the Commissioner to demonstrate that the claimant retains the physical residual functional capacity (RFC) to perform a significant number of other jobs in the national economy that are consistent with the claimant's impairments and vocational factors such as age, education and work experience. Id.

Under the first step of the above analysis, the ALJ determined that Ms. Shady had not engaged in substantial gainful employment since August 1, 2001. (Tr. 14, 19). At the second and third steps, the ALJ determined Ms. Shady has a history of arthritis of the knees, diabetes, coronary artery disease, depression, anxiety, and is status post triple bypass surgery, but that these impairments do not meet, equal, or approach the level of severity of one of the listed impairments. (Tr. 14, 19). At the fourth and fifth steps, the ALJ determined that Ms. Shady has the residual functional capacity to perform the physical exertion and nonexertional requirements of work limited to lifting and carrying 10 pounds frequently and occasionally; standing and/or walking two hours in a workday; no climbing, balancing, kneeling, crouching, or crawling activities; occasional stooping; a stand/sit option; and limited to simple repetitive work and low stress work. (Tr. 19) The ALJ found that Ms. Shady is incapable of returning to her past relevant work, but is able to

perform a significant number of other jobs in the local and national economy. (Tr. 18-19, 20). Thus, the ALJ found that Ms. Shady is not "disabled." (Tr. 19, 20-21).

## Opinion of Treating Physician

First, Ms. Shady argues that the ALJ erred in discounting opinions offered by Dr. Petersen, her treating physician of approximately five years, as to her work-related limitations.[1] According to Ms. Shady, Dr. Petersen's opinions regarding her limitations were properly supported by medically acceptable diagnostic techniques and, therefore, entitled to controlling weight. Alternatively, Ms. Shady contends that the ALJ failed to conduct the proper analysis in disregarding Dr. Petersen's opinion, i.e., the ALJ found Dr. Petersen's opinion to be inconsistent and unsupported, which meant that it was not entitled to controlling weight, but the ALJ subsequently failed to set forth clear and convincing reasons to support that decision. Ms. Shady submits that the ALJ did not mention, much less discuss, the fact that Dr. Petersen is a treating source who has seen Ms. Shady for all of her ailments approximately twice a month for five years. Ms. Shady argues that the ALJ did not properly consider the entire record when assessing the weight to be given to Dr. Petersen's opinion[2].

---

[1] Specifically, Ms. Shady refers to Dr. Petersen's August 6, 2003 residual functional capacity (RFC) assessment, which opined that Ms. Shady could sit no more than 15 minutes before she would need to get up (due to leg cramps), could sit less than two hours total in an eight-hour working day, would need to get up and walk for five minutes every fifteen minutes, would need unscheduled breaks up to every hour of an eight-hour work day, should avoid concentrated to all exposure to every environmental restriction except perfumers, which exposure was unrestricted, and would be absent from work more than four days per month as a result of her impairments or treatment.

[2] In support of this argument, Ms. Shady refers to a number of abnormal EKG tests conducted since her 1999 bypass surgery, several admissions to various hospitals with complaints of chest pain, and her family medical history, none of which she claims was mentioned in the ALJ's decision.

13

Second, Ms. Shady argues that the ALJ erred in assessing her environmental restrictions, i.e., "Dr. Petersen imposed environmental restrictions upon claimant but the evidence fails to show claimant suffers from any type of a pulmonary disease." (Tr. 18). Ms. Shady contends that the ALJ improperly substituted her own opinion for that of both Dr. Petersen and the consulting physician, who opined that Ms. Shady should avoid concentrated exposure to extreme cold, extreme heat, and fumes, odors, dusts, gases, poor ventilation, etc. due to her C.A.D. (presumably coronary artery disease). (Tr. 212).

Third, Ms. Shady claims that the ALJ erred in assuming an ability to perform sedentary work based on Ms. Shady's daily activities, where the record does not indicate the sustained effort, eight hours a day, five days a week, which is necessary to determine a RFC of sedentary work.

In response, the Commissioner argues that Dr. Petersen's status as a treating physician was duly noted by the ALJ, and his opinion was properly discounted by the ALJ, notwithstanding his treating physician status, given the absence of specific clinical, x-ray or laboratory findings to support his assigned limitations. The Commissioner further points to a statement made in 2003 by Ms. Shady's treating cardiologist, Dr. Albaghdadi, that Ms. Shady had "no activity limitation," and the fact that Dr. Petersen's treatment notes do not support a finding that Ms. Shady would miss four or more days of work per month due to her impairments. Finally, the Commissioner contends that Ms. Shady's family medical history was specifically addressed by the ALJ.

With respect to Dr. Petersen's environmental restrictions, the Commissioner claims that they were properly discounted as well, i.e., Dr. Petersen's restrictions were inconsistent insofar as they indicated that she should avoid all exposure to fumes, odors, dusts, and gases, but was not restricted in exposure to perfumes. Regardless, the
14

Commissioner contends that the jobs identified by the ALJ do not present any environmental conditions.[3]

Regarding Ms. Shady's daily activities, the Commissioner argues that Ms. Shady's ability to clean her home, wash dishes, and do laundry (all with her daughter's help), spend time with her children, prepare simple meals, dress and wash herself, pay her bills and manage her finances, shop for food and necessities, and drive show that she is quite active and could sustain a normal work schedule. Such activities, the Commissioner contends, are inconsistent with claims of disabling pain.

"A treating physician's opinion should not ordinarily be disregarded and is entitled to substantial weight. A treating physician's opinion regarding an applicant's impairment will be granted controlling weight, provided the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record." Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000) (citation omitted). The regulations require the ALJ to give reasons for giving weight to or rejecting the statements of a treating physician. See 20 C.F.R. § 404.1527(d)(2). Whether the ALJ gives great or small weight to the opinions of treating physicians, the ALJ must give good reasons for giving the opinions that weight. Holmstrom v. Massanari, 270 F.3d 715, 720 (8th Cir. 2001). "The ALJ may discount or disregard such an opinion if other medical assessments are supported by superior medical evidence, or if the treating physician has offered inconsistent opinions." Hogan v. Apfel, 239 F.3d 958, 961 (8th Cir. 2001).

A treating physician's opinion does not deserve controlling weight when it is nothing more than a conclusory statement. Piepgras v. Chater, 76 F.3d 223, 236 (8th Cir. 1996). See also Thomas v. Sullivan, 928 F.2d 255, 259 (8th Cir. 1991) (holding that the weight given a treating physician's opinion is limited if the opinion consists only of

---

[3] See Dictionary of Occupational Titles §§ 209.587-101, 211.462-026, 249.587-018.

conclusory statements). Generally, a consulting physician's opinion is not considered substantial evidence, especially if contradicted by a treating physician. Charles v. Barnhart, 375 F.3d 777, 783 (8th Cir. 2004). See also Kelley v. Callahan, 133 F.3d 583, 589 (8th Cir. 1998) ("The opinion of a consulting physician who examines a claimant once or not at all does not generally constitute substantial evidence.").

Dr. Petersen's status as a treating physician was duly noted and considered by the ALJ, i.e., "[a]lthough Dr. Petersen is a treating source and generally controlling weight is given to a treating source's opinion." (Tr. 18). In reviewing the record as a whole, the court finds substantial evidence to support the ALJ's decision not to give Dr. Petersen's opinion controlling weight. Further, the court finds that the ALJ's decision regarding Dr. Petersen was appropriately explained in her decision. While EKG tests did reveal "an incomplete right bundle branch block and nonspecific ST abnormalities," they also indicated no acute pathology, as did numerous chest x-rays. The chest x-rays also indicated no evidence of active heart or lung disease. Her heart rate, rhythms, and heart size have consistently been normal. As late as July 10, 2003, Ms. Shady's treating cardiologist stated that she had no activity limitation. On January 5, 2004, Ms. Shady was seen by Dr. Hamilton, who noted that Ms. Shady had no chest pain, no shortness of breath, was feeling fine, ambulating, taking care of her grandchild, and could actually benefit from increased exercise and ambulation. Considered in whole, the medical evidence does not support Dr. Petersen's extreme limitations. Further, that the ALJ did not specifically mention Ms. Shady's family's medical history is of no import as it is only Ms. Shady's ability to work that is at issue. Finally, the ALJ's analysis of Ms. Shady's environmental restrictions is not grounds for reversal as the jobs identified by the ALJ do not present any environmental conditions.

Regarding Ms. Shady's daily activities, substantial evidence in the record as a whole supports the ALJ's decision that Ms. Shady's activities are consistent with a sedentary level of exertion. Ms. Shady prepares simple meals, tends to her own personal needs, manages

the family finances, shops for groceries and necessities, drives, and handles her own medication. She also cares for her two children, does housework with her children's help, watches movies, plays video games, and occasionally goes to the park with her children. The ALJ did not err in this conclusion.

## Improper Hypothetical Question

An improper hypothetical cannot serve as substantial evidence. Whitmore v. Bowen, 785 F.2d 262, 263-64 (8th Cir. 1986). The hypothetical should precisely describe the claimant's impairments in order for the expert to properly evaluate the availability of jobs the claimant can perform. Newton v. Chater, 92 F.3d 668, 694095 (8th Cir. 1996). The question need only include impairments supported by substantial evidence and not impairments rejected by the ALJ. Long v. Chater, 108 F.3d 185, 188 (8th Cir. 1997).

"Likewise, the testimony of a vocational expert who responds to a hypothetical based on such evidence is not substantial evidence upon which to base a denial of benefits. Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000) ("These assessments alone [of non-treating physicians] cannot be considered substantial evidence in the face of the conflicting assessment of a treating physician." Id. (citing Henderson v. Sullivan, 930 F.2d 19, 21 (8th Cir. 1991)); Baker v. Apfel, 159 F.3d 1140, 1144 (8th Cir. 1998) ("If a hypothetical question does not include all of the claimant's impairments, limitations, and restrictions, or is otherwise inadequate, a vocational expert's response cannot constitute substantial evidence to support a conclusion of no disability.").

As set forth above, the ALJ's hypothetical question properly included only impairments which were supported by substantial evidence. The impairments rejected by the ALJ, i.e., three absences or more per month and a 15-minute break every hour, even though stated by Ms. Shady's treating physician, were not supported by the medical evidence. Thus, the ALJ's decision to reject those impairments will not be reversed.

Upon the foregoing,

IT IS ORDERED that the final decision of the Commissioner of Social Security is affirmed and this matter is dismissed.

September 22, 2005.

JOHN A. JARVEY
Magistrate Judge
UNITED STATES DISTRICT COURT